UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 21-CR-223

VICTOR COBIAN,

Defendant.

---

**UNITED STATES' RESPONSE TO THE DEFENDANT'S MOTION FOR UNREDACTED DISCOVERY**

---

On January 31, 2024, the defendant filed a motion for unredacted discovery because of the release of a December 9, 2023, Reuters news article, *How a Factory City in Wisconsin Fed Military-Grade Weapons to a Mexican Cartel* ("Reuters Article") (Attachment A) that discussed the details of Victor Cobian's cartel-connected firearm smuggling scheme, which is charged in *United States v. Victor Cobian et al*, 21-CR-223.

The main sources for the Reuters Article include Victor Cobian, Victor Cobian's brother, Victor Cobian's mother, two retired ATF agents, a Mexican legal advisor, a Mexican government official, federal firearms licensees, named citizen sources, two unknown sources, and publicly accessible case information. The Reuters Article states that the reporter also reviewed "Internal ATF documents", but it is unclear what those documents were. It is clear that Victor Cobian and his family were sources for a substantial portion of the story, including discussions of people who they believed were involved in the scheme.

*I. Case Background*

Defendants Victor Cobian, Dejan Zoric, Cristina Cole, Michael Preston, Juan Arturo Charles, Richard Mosqueda, Rafael Preciado, and Jesus Cisneros-Hernandez are charged with

crimes related to a conspiracy to purchase firearms in the United States, smuggle the firearms into Mexico, and supply the firearms to the Cartel de Jalisco Nueva Generación, a transnational criminal organization. *See* Dkt. #1.

The United States has provided discovery to all defendants, which includes reports with the redacted names of confidential informants ("CIs"). On April 5, 2022, Magistrate Judge Stephen C. Dries signed a standard protective order ("Protective Order") for discovery, which, in part, restricted the defendants' dissemination of discovery materials. *See* Dkt. #29.

The instant dispute concerns the United States' efforts to protect CIs by redacting their names from discovery. It is undisputed that pursuant to the Trial Court's regular procedures, which are in line with the governing case law, the United States would be required to turn over its witness list to Victor Cobian prior to trial. That list would reflect the CIs' full names, if they were to testify at trial. *See* Dkt. #105.

*II. There Is No Legal Basis To Deviate From This Court's Regular Procedures And Require Early Disclosure Of Witness Information.*

If a trial is conducted in this case, the defense will have a right to cross examine the witnesses the government calls at trial and to pretrial disclosure of those witnesses' names. The Trial Court has already established a procedure for when the United States must provide those witnesses' names. *See, e.g., United States v. Delatorre*, 581 F. Supp. 2d 968, 980–81 (N.D. Ill. 2008) (rejecting a claim that a defendant was "entitled to a new trial because the Court improperly denied his motion for pretrial discovery of the government's witness list" and stated that the "argument [was] without merit" because "throughout trial, the government provided to defense counsel one week in advance the list of upcoming witnesses and complete copies of their statements, including their names").

There is no general constitutional right to discovery in criminal cases. *See, e.g.*, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case."); *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996) ("There is no constitutional right to pretrial discovery.") (citing *Wardius v. Oregon*, 412 U.S. 470, 474 (1973)); *United States v. Johnson*, No. 11-20551, 2012 WL 1230138, at *1–2 (E.D. Mich. Apr. 12, 2012) ("Defendant Johnson's contention that under 'our system of justice [a] defendant should have the names of his accusers and the information they claim to inculpate the defendant sufficiently in advance of trial in order to prepare a defense' *is simply wrong*.") (emphasis added); *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 4009883, at *2 (N.D. Cal. Oct. 13, 2010) (ordering that officer names and the dates of various events be unredacted, but noting the self-evident fact that "the name of the witness . . . should remain redacted for safety reasons").[1]

As a result, Victor Cobian has no constitutional entitlement to obtain the CIs' full names now, nor is the government violating any of Victor Cobian's rights by redacting sensitive witness information from discovery. *See United States v. DeRobertis*, 766 F.2d 270, 274 (7th Cir. 1985) ("There is no constitutional right to discover evidence favorable to the state in a criminal case, so the inability of a defendant to interview witnesses is a constitutional problem only if the state 'artificially restricted' the defendant's ability to obtain evidence.") (citation omitted).

Similarly, Federal Rule of Criminal Procedure 16 does not require pretrial disclosure of potential prosecution witnesses. Rather, Rule 16's *exemptions* from general disclosure requirements include material that might contain sensitive witness information, such as statements

[1] The defendant ultimately has a right to cross-examine witnesses, but witness safety concerns are so paramount that even at trial, in some cases, the government need not provide a witness's real name. *See United States v. Ramos-Cruz*, 667 F.3d 487, 501 (4th Cir. 2012) (allowing witnesses to testify under pseudonyms given the possibility of violent retaliation).

of prospective government witnesses and reports created by government agents in connection with investigating or prosecuting the case. *See United States v. Fort*, 472 F.3d 1106, 1109-10 (9th Cir. 2007).

In this District, the United States generally follows an "open file" discovery policy that is more generous than Rule 16. The "open file" policy is memorialized in the Local Rules. Those Rules establish that, even when following its "open file policy," the government "retains the authority to redact from open file material anything … that the government reasonably believes … would jeopardize the safety of a person other than the defendant." Local Rule 16(a)(2). The Local Rules also provide that "open file" material does *not* include "material identifying confidential informants." Local Rule 16(a)(3).

Under the Local Rules, the defendant is permitted to challenge the government's redactions. Local Rule 16(a)(2). That challenge turns on whether the redacted material "identif[ies] confidential informants"—in which case the material is not subject to "open file" discovery at all —and, even if no confidential informants are involved, whether "the government reasonably believes [the redacted material] would jeopardize the safety of a person other than the defendant." Local Rule 16(a)(2), (a)(3).

In this case, the government should prevail on both criteria: The CIs are protected as "confidential informants," and their identities are therefore privileged; and the government "reasonably believes" that releasing their identities could "jeopardize [their] safety." The defense has not made, and cannot possibly make, a showing the government does not hold that belief reasonably and in good faith.

*III. The Personal Identifying Information of a Confidential Informant is Privileged and Revealing the CIs Names Would Endanger Witnesses.*

The crux of Victor Cobian's argument is that because there is a public news article discussing the details of Victor Cobian's cartel-connected firearm smuggling scheme, the United States must unredact the names of the CIs. This argument should be rejected. First, the Reuters Article is based on multiple sources, including Victor Cobian and his family. It would be inequitable to allow the defendant to demand the release of CIs' names due to a news article that he and his family largely contributed to generating. It is clear that Victor Cobian and his family provided the reporter with significant information for the story, including people they believed were involved in the scheme. Second, the release of the Reuters Article does not change the need to protect CIs and witness safety. If anything, it enhances the need to protect witnesses due to more widespread knowledge of the case. Lastly, there is no legal basis for unredacting the discovery due to the release of the Reuters Article. There is, however, a significant legal basis for maintaining the redactions of the CIs' names.

<u>The Legal Basis for Maintaining Redacted CI Names: The Personal Identifying Information of a Confidential Informant is Privileged</u>

As the Local Rules recognize, the government has a "limited privilege" to withhold the identity of an informant from a criminal defendant. *United States v. Harris*, 531 F.3d 507, 514 (7th Cir. 2007) (citing *Roviaro v. United States*, 353 U.S. 53, 59-60 (1957)). "The government is granted this limited privilege as a right and need not make a threshold showing of likely reprisal or retaliation against the informant in order to assert the privilege." *United States v. Valles*, 41 F.3d 355, 358 (7th Cir. 1994) (citing *Dole v. Local 1942*, 870 F.2d 368, 372 (7th Cir. 1989)). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge

of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro,* 353 U.S. at 59.

Confidential informants come in multiple forms: some are mere "tipsters," "whose only role was to provide the police with the relevant information that served as the foundation for obtaining a search warrant," and others are "transactional witness[es]," who "participated in the crime charged against the defendant or witnessed the event in question." *Harris*, 531 F.3d at 515. The CIs in this case plainly fall into the third category: transactional witnesses.

When deciding whether the government's "informant" privilege must yield to a defendant's right to prepare a defense, the Court must conduct a balancing test, "taking into account the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." *United States v. Gutierrez,* 931 F.2d 1482, 1490 (11th Cir. 1991) (*citing Roviaro*, 353 U.S. at 62). In applying the balancing test, the Court must consider three factors: "the extent of the informant's participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and the government's interest in nondisclosure." *Id*. (*citing United States v. Tenorio-Angel*, 756 F.2d 1505, 1509 (11th Cir. 1985)).

The participation of the CIs in this case was substantial. Yet, this is not a case where disclosure is necessary because a CI was the sole participant, other than Victor Cobian, in the criminal activity. *See Roviaro*, 353 U.S. at 64-65; *see also United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (it is not sufficient that the informant was a participant and witness to the crime). In this case, aside from Victor Cobian and the CIs, there were multiple people who could competently testify as to the events that occurred. Thus, the involvement of the CIs does not alone mandate disclosure. *See Gutierrez,* 931 F.2d at 1491.

Next, the CIs would not significantly aid in establishing an asserted defense—Victor Cobian has provided no argument to support this claim. The substance of the CIs statements and reports are within Victor Cobian's possession. The only redacted information are the CIs names, which is not needed to prepare any defense. The testimony of the CIs would not be exculpatory or otherwise aid in establishing a defense. On the contrary, the expected testimony would be consistent with evidence that incriminates Victor Cobian.

The United States' Witnesses Would Be Endangered by Unredacting Discovery

Finally, the government has an interest in nondisclosure; specifically, disclosure could endanger the informant or other investigations. *See Tenorio-Angel*, 756 F.2d at 1509. In this case, the CIs participated in activities with individuals closely affiliated with Cartel de Jalisco Nueva Generación, a transnational criminal organization, which is notoriously dangerous. *See United States v. Koerth, 312 F.3d 862, 870 (7th Cir.2002)* ("It is 'beyond dispute that drug traffickers are often armed and dangerous' ....") (quoting *United States v. Ocampo*, 890 F.2d 1363, 1369 (7th Cir.1989)). Witnesses have received recent threats and disclosure would therefore subject the CIs to an unnecessary risk of harm and could be evidence of new crimes. *See* Sealed Statement. Accordingly, as noted above, Victor Cobian's request for unredacted discovery should be denied.

**Conclusion**

For the reasons described above, this Court should deny the defendant's motion for unredacted discovery.

Dated at Milwaukee, Wisconsin this 15th day of February, 2024.

Respectfully submitted,
GREGORY J. HAANSTAD
United States Attorney

By: */s/ Christopher Ladwig*
Christopher Ladwig

Philip Kovoor
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Wisconsin
517 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

# ATTACHMENT A



A REUTERS SPECIAL REPORT

# How a factory city in Wisconsin fed military-grade weapons to a Mexican cartel

Houses line the streets of the small industrial city of Racine, Wisconsin, U.S. REUTERS/Brian Snyder

A single sniper rifle led investigators to a syndicate deep in the United States that armed Mexico's fentanyl-trafficking Jalisco New Generation Cartel.

By SARAH KINOSIAN | Filed Dec. 9, 2023, 11 a.m. GMT

Racine, Wisconsin is best known for factories, farming, and an extravagant televised prom celebration.

But in 2018, Racine's suburban sprawl on the edge of Lake Michigan became a source of high caliber weapons for one of Mexico's top fentanyl trafficking gangs, the Cartel Jalisco Nueva Generacion (CJNG), U.S. federal arms-trafficking investigators allege.

The cartel exploited permissive federal and state-level gun control rules to buy some of the most powerful weapons available to American civilians, according to two former agents with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and two other sources, all with knowledge of the investigation.

Members of a local family, working with a cousin in Mexico, enlisted friends and relatives who bought guns on their behalf in Racine and transported them to California and south across the border, according to an indictment from Wisconsin's Eastern District Court unsealed in February.

PODCAST: REUTERS WORLD NEWS

Listen now: A reporter's journey tracing gun trafficking from Wisconsin to Mexico

Their clients included a hit squad reporting to CJNG leader Nemesio Oseguera, better known as "El Mencho," according to Chris Demlein, one of the former ATF agents.

The Racine case unlocked "the most prolific CJNG firearms trafficking network ever discovered," said Demlein, who until 2021 served as a senior special agent with ATF and oversaw a multi-agency arms trafficking project that coordinated dozens of investigations.

The traffickers in Racine and two connected cells in other locations bought more than $600,000 of high-end military-style firearms in under a year, internal ATF documents reviewed by Reuters allege. It seemed like an unprecedented shopping spree, said Tim Sloan, the other former ATF investigator. Sloan was the first to trace a CJNG gun to Racine.



An employee shows a .50 caliber Barrett M107A1 semi-automatic rifle to Reuters at a gun store in Racine, Wisconsin where local residents sourced weapons to be smuggled to the CJNG cartel, according to a federal indictment. REUTERS/Brian Snyder

This account of the CJNG gun trafficking ring is based on a review of U.S. and Mexican law enforcement documents and interviews with two individuals alleged to have procured guns for the cartel as well as with eight current and former U.S. and Mexican officials. Reuters was able to chronicle the extent of the operation uncovered by ATF agents as they followed the trail of military-style guns back to the United States from the Mexican state of Jalisco, almost 2,000 miles away.

Racine was just the tip of the iceberg. The city was a key part of a CJNG firearms network that bought hundreds of guns from more than a dozen U.S. states, specializing in semi-automatic .50 caliber rifles and FN SCAR assault rifles designed for U.S. special forces, internal ATF reports obtained by Reuters allege.

ATF dubbed the Wisconsin case "Grin and Barrett," after Barrett, a Tennessee-based weapons maker whose powerful .50 caliber firearms were among those trafficked by the network. Now a unit of Australia's NIOA Group, Barrett did not respond to detailed requests for comment for this report.

ATF spokesperson Kristina Mastropasqua declined to comment on what she described as an open case. Mastropasqua said preventing cross-border firearms trafficking was an ATF priority and new powers had led to 250 people being charged since last year.

Commenting on this story's findings, Alejandro Celorio, legal advisor to Mexico's foreign ministry, said those involved in the U.S. firearms business should be more careful to "prevent their products from falling into the wrong hands."

The Racine Mayor's Office did not respond to a request for comment.

Reuters was unable to reach representatives for CJNG or Oseguera.

## The reach of CJNG's alleged gun trafficking network

From North Carolina to Oregon, the CJNG network reached deep into the United States to find and buy heavier, rarer firearms, Sloan and Demlein said. Far from the border cities that are the usual sources of weapons for Mexico's criminal groups, relaxed surveillance can make such weapons easier to buy in quantity, they said.

Overseeing much of the network was Mexican citizen Jesus Cisneros, according to ATF internal presentations that cited his intercepted communications with other suspects about moving .50 calibers and other firearms to Mexico. The Wisconsin indictment charged Cisneros and a local accomplice named Victor Cobian on multiple counts related to gun trafficking.

One internal ATF presentation cited more than 28 pending indictments related to the wider network. Reuters could not independently corroborate the status of the cases.

A spokesperson for the Eastern District of Wisconsin Attorney's Office said they could only comment on public court records, adding those records suggested Cisneros was "the lead player" in the Wisconsin conspiracy.

**$600,000**

Value of high-end military-style firearms trafficked from Racine and two connected cells in under a year

Cisneros is believed to reside in Mexico, one of the sources with knowledge of the investigation said. The source requested anonymity to speak freely.

Cobian told Reuters in an interview that Cisneros was his cousin and lived in Jalisco. Cobian, who pleaded not guilty to gun-trafficking charges, denied involvement in or knowledge of the alleged trafficking scheme. Reuters was unable to locate or contact Cisneros or his representatives.

Mexican law enforcement agencies did not respond to inquiries about Cisneros but did acknowledge that Mexican authorities automatically freeze the accounts of individuals sanctioned by the U.S. Treasury. Cisneros was sanctioned by the U.S. Treasury in February.

The indictment charged Cisneros, Cobian and six other accomplices with felonies ranging from false statements to unlicensed gun dealing and smuggling. The alleged accomplices included Cobian's sister and her fiance, who also entered not guilty pleas. A jury trial was set for May 6, 2024, court filings show.

## Mexican states where .50 caliber rifles and machine guns were recovered

1 gun 61 guns

Jalisco

Source: ATF document
Map data: © OSM

## Gun thirty-one

The existence of the wider Cisneros network and Wisconsin's role in it may never have come to light had it not been for a single Barrett .50 caliber rifle picked up by police in a 2018 raid in Mexico's second-largest city, Guadalajara, the state capital of Jalisco.

Sloan, ATF's attache at the U.S. embassy in Mexico City at the time, called the weapon "the key" to the CJNG gun pipeline.

Weighing 30 pounds, Barrett .50 calibers are used by militaries around the world for their ability to rip through armored vehicles from over a mile away. They are among the most powerful weapons civilians can buy in the United States through licensed dealers and sell for around $9,000.

In Mexico, they are popular with organized criminal groups. CJNG uses .50 calibers to defend routes through which the U.S. Justice Department says thousands of tons of fentanyl and methamphetamine are shipped to U.S. consumers.




Members of the Jalisco New Generation Cartel (CJNG) pose for a photo at an undisclosed location in Michoacan state Mexico. One of the men bears the insignia of the Delta hit squad that reports to cartel leader Nemesio Oseguera and that U.S. federal investigators say received a gun that came from the Racine gun store. REUTERS/Stringer

The cartel's highly-trained, uniformed squadrons have used the guns to down a police helicopter, to kill 13 policemen in an ambush, and in a failed hit on Mexico City's top cop, Mexican and U.S. authorities say.

On May 21, 2018, gunmen from a CJNG hit squad known as Delta tried to kill a Jalisco government minister – who previously served as the state's attorney general – in a brazen afternoon attack outside a Japanese restaurant near the city center.

A few weeks later, on June 9, a team of Mexican Federal Police investigating the attack gathered before dawn outside a Guadalajara cemetery, across from a two-story building used by Delta, detailed handwritten Federal Police records show.

Delta reports directly to CJNG head Oseguera, according to a cartel organization chart from Mexico's National Guard, seen by Reuters. In 2021, a Mexican court convicted Delta gunmen for the Guadalajara attack.

Agents crept into the bright orange house through the garage. Moving upstairs, they found 36 weapons, including grenade launchers and nearly 8,000 rounds of ammunition, the police records said.

A Jalisco ballistics lab report seen by Reuters showed 27 of the firearms were traced to the United States. It did not establish if the weapons were used in the attack.

But one of them, a Barrett .50 caliber registered as Gun #31 in the report, led investigators to Wisconsin.



An injured woman lies on a stretcher after an ambush on a former prosecutor in Guadalajara, Mexico in 2018. The attack triggered an investigation that led police to a .50 caliber Barrett rifle that U.S. agents later traced to the Wisconsin gun store. REUTERS/Stringer

## Shooters' Sports Center

Sloan traced the weapon to Shooters' Sports Center, a Racine gun shop, where a man called Elias Cobian picked it up on April 9, two months before the Guadalajara raid, according to ATF trace data and purchase records shown to Reuters by store employees.

Two days after Elias picked up the gun, on April 11, his brother Oswaldo Cobian picked up another .50 caliber, the records show. Oswaldo picked up another one a couple of months earlier. Shooters' Sports Center declined to say how much the weapons had sold for.

The Cobian brothers are cousins of Victor Cobian, two family members told Reuters. ATF investigation documents reviewed by Reuters allege the cousins worked together closely to traffic weapons.

Victor's older brother, Marco Cobian, said he was surprised when he heard early in 2018 that an associate of Elias and Oswaldo was going around asking people to buy guns.

Later, when Elias and Oswaldo got in trouble, it "all made sense," said Marco, who lives in the Racine area and works construction.

One successful recruit was Elias and Oswaldo's friend and coworker at an energy infrastructure company, a local man called Patrick Finnell.




The Shooters' Sports Center, where Racine residents acquired .50 caliber Barrett semi-automatic rifles to be trafficked to the CJNG in Mexico, according to the federal indictment. The gun store says it does not condone the illegal movement of firearms. REUTERS/Brian Snyder

On July 10, Finnell walked out of Shooters' Sports Center with another Barrett .50 caliber. In an interview, Finnell confirmed buying the weapon. The rifles bought by Finnell and the Cobian brothers were identified in the indictment as being picked up at the store to be trafficked into the arsenal of CJNG.

Finnell said in the interview he bought the weapon on behalf of the brothers, who he said told him the gun was going to Mexico, adding he thought "they were full of shit." Finnell didn't respond to follow-up interview requests.

The brothers and Finnell are not charged or named in the Wisconsin indictment, which connects the guns they picked up at Shooters' Sports Center to three unidentified co-conspirators. Reuters was unable to locate or contact the brothers or their representatives for comment. The Wisconsin Eastern District Attorney said it could not comment on individuals not named in the indictment.

Shooters' Sports Center was lucky to sell one Barrett .50 caliber in a normal year, employees said.

In just six months in 2018, the crew had picked up four from the store.

In Wisconsin, licensed dealers can legally sell multiple high-caliber semi-automatic rifles to adults. "We do not condone the illegal movement of firearms," store owner Bernie Kupper said in an email. He said it was not unusual for people to refer friends and family to the store.

Finnell himself bought three more .50 calibers in the Racine area, the first source close to the investigation said. Finnell declined to either confirm or deny whether he bought more for the brothers, telling Reuters he would "rather leave that to the side."

The rash of sales of .50 calibers caught the eye of Wisconsin agents from ATF's field offices in Milwaukee, according to the first source, who requested anonymity to speak freely.

Over the next few months, the agents dug further.

## Quarter of a million guns

In the past three years alone, Mexican authorities have seized 300 .50 calibers, a record, according to previously unpublished data collated by the Mexican attorney general's office and seen by Reuters.

Once in Mexico, the gun's black market value increases to between $30,000 and $50,000, according to Demlein and Sloan.

The great majority of illegal guns in Mexico come from the United States, Mexican and U.S. authorities say. A 2013 University of San Diego study estimated a quarter of a million guns illegally cross the border each year.

Mexico, a country of 127 million people, has tight gun laws – and just a single gun store, located on a military base. By contrast, the United States has nearly 78,000 gun dealers – more than the combined number of McDonald's, Burger King, Subway and Wendy's franchises, according to gun-control advocates Everytown for Gun Safety.